JOSEPH WALLINGSFORD, PLAINTIFF IN ERROR V. SARAH ANN ALLEN, FOR HERSELF AND CHILDREN.

A wife having separated herself from her husband, for ill-treatment by him, applied to the county court of Prince George, Maryland, for alimony, which was allowed to her, pendente lite. The husband gave the wife a female negro slave, and some other property, in discharge of the alimony. She removed to Washington, hired out the slave, and afterwards, in consideration of a sum of money, and for other considerations, she manumitted, by deed, the slave, and her two infant children, the eldest not three years old. Some time after the agreement between the husband and wife, a final separation took place between them, by a verbal agreement; each to retain "the property each had, and to be quits for ever," and the wife relinquished all further claim for alimony. After the death of the wife, the husband claimed the female and her children, as his slaves. Held, that they were free by virtue of the deed of manumission executed by the wife.

This is a case where a transfer of property must be considered as having been made for a valuable consideration. It was given in lieu of alimony, decreed by a court of competent jurisdiction, pendente lite; and passed the property as fully to the wife, as if the husband had conveyed it to a third person for a valuable consideration. In regard to that property, the wife is to be considered as a feme sole; and her right to dispose of it followed as a matter of coure.

Construction of the act of assembly of Maryland of 1796, 2 Maxcy's Laws 360, relative to the manumission of slaves.

The terms of the Maryland act, and the policy of it, were meant to prevent the manumission of slaves, who, from infancy, age or decrepitude, would become burthensome to the community at the time the deed of manumission should take effect: and to such as were over the age, after which manumission is prohibited. But the slave manumitted must either be positively in the latter predicament, or be so decrepid, if under the age of forty-five; and if neither one nor the other, and being in infancy, it must stand so unrelated to any other free person coloured or white, that it can have no claim, natural or artificial, to support from any one; and must, therefore, be a charge upon the charity of the community, or a charge upon its poor laws. It would be an unreasonable restraint upon the privileges of manumission, as it is granted in this act, if it were interpreted to exclude the manumission of mother and an infant child, the former being of healthy constitution and able to maintain it, as of other children who, in the natural progress of human life would be able, in a few years, to maintain themselves by labour, and who would find in their adolescence, persons who would gladly maintain them for the services they could render.

Agreements between husband and wife, during coverture, for the transfer from him of property directly to the latter, are undoubtedly void at law. Equity examines with great caution before it will confirm them. But it does sustain them when a clear and satisfactory case is made out, that the property is to be applied to the separate use of the wife; where the consideration of the transfer is a separate interest of the wife, yielded up by her for the husband's benefit, or of their family; or which has been appropriated by him to his uses: where the husband is in a

situation to make a gift of property to the wife, and distinctly separates it from the mass of his property for her use. Either case equity will sustain, though no trustee has been interposed to hold for the wife's use.

IN error to the circuit court of the United States for the county of Washington in the District of Columbia.

On the 4th day of August 1834, the defendant in error presented to the circuit court a petition stating, that she and her two infant children were entitled to their freedom ; and that she and they were unjustly held as his slaves, by Joseph Wallingsford, the plaintiff in error. Joseph Wallingsford appeared to the subpœna issued on the petition, and put in a plea, denying the claims of the petitioner. The case was tried by a jury at the circuit court held in March 1835, and a verdict was found for the petitioner under the charge of the court, from which the plaintiff in error took three bills of exceptions; and prosecuted, from the judgment of the court, this writ of error.

On the trial of the cause in the court below, the petitioner pro-duced a regular deed of manumission, duly recorded, executed by Rachel Wallingsford, the wife of the plaintiff in error, dated the 8th of September 1826 ; by which, and for divers good causes and consider-ations, and in consideration of the sum of 150 dollars paid to her, she released the petitioner and her children from slavery; the petitioner being at that time nineteen years old, and her two female children of the respective ages of three years and five months.

The petitioner also proved, that Rachel Wallingsford resided in the city of Washington, for many years, as a feme sole, previous to the date of the deed ; that she had a suit for alimony depending in Maryland, against Joseph Wallingsford, he residing in that state; and that the court ordered her husband to pay her 120 dollars per year, as alimony, pendente lite ; that some time after that allowance had been made to her, her husband gave the petitioner to her, then about twelve years old, and some other property, in discharge of the order of alimony, his wife agreeing not to prosecute the claim any further ; that after the petitioner was so given to Mrs Wallingsford, she lived with her, or was hired out in Washington, until the date of the deed of manumission ; that on the death of Mrs Wallingsford, the plaintiff in error claimed her, and her children, as his slaves.

The court permitted the deed of manumission to be read in evi-dence to the jury, by the counsel for the petitioner ; expressly leav-ing it to the jury to say, or find from the evidence, whether the title of the said Rachel to the said negro Sarah Ann, at the time of the

execution of the said deed, was absolute, or only for the life of the said Rachel; and the court instructed the jury that that question was open for their consideration upon all the evidence in the cause.

The defendant in the circuit court excepted to the admission of the deed of manumission in evidence, and to the instructions given to the jury.

The defendant, by his counsel, prayed the court to instruct the jury, that if they should believe from the evidence aforesaid (viz. the evidence stated in the first bill of exceptions), that Mrs Wallingsford held the petitioners by virtue of an agreement made between her and her husband, without the intervention of a trustee; that said agreement is null and void, and could give no power to Mrs Wallingsford to manumit the slaves held by virtue of such an agreement. The court refused to give this instruction, and the defendant excepted to the refusal.

The defendant prayed the court to instruct the jury, that if they should believe from the evidence, that an agreement was made between the defendant and Mrs Wallingsford, by which she was to have the petitioners in lieu of being supported by him as his wife; yet, if there was no covenant on the part of a trustee, or some one capable of contracting with the husband, that he should not be liable to the maintenance of his wife: the same is null. The court refused to give this instruction, and the defendant excepted.

The defendant prayed for the court to instruct the jury, that if they should believe from the evidence, that an agreement existed between him and Mrs Wallingsford, that he should transfer the petitioner to her, on condition that she should relinquish all claim to alimony against him; that then, should the jury believe from the evidence, that she did not comply with this condition, and that she did prefer against him a subsequent claim for alimony; that then the agreement cannot be enforced against the defendant, nor can he be deprived of any of his rights by virtue of the said agreement. The court refused to give this instruction, and the defendant excepted.

The defendant then prayed the court to instruct the jury, that if they should believe, from the evidence aforesaid, that the petitioners or any of them, at the time of the execution of the deed of manumission aforesaid, were not able by their labour to procure for themselves sufficient food or raiment, with other necessary requisites of life, then the said deed of manumission as to them, or such of them, was inoperative; which instruction the court gave: and also on the

prayer of the counsel for the petitioners, further instructed the jury, that if they should believe, from the said evidence, that the negroes abovementioned were of healthy constitutions, and sound in mind and body, and that their mother was capable by labour to procure to them sufficient food and raiment, with other requisite necessaries of life, and did maintain them ; then such children are not under the incapacity intended by the Maryland law.

The defendant excepted to the last instruction.

The case was argued by Mr Brent, for the plaintiff in error; and by Mr Dandridge and Mr Key, for the defendant.

Mr Brent contended, that:

1. The court below erred in permitting the deed of manumission from Rachel Wallingsford, the wife, to be read in evidence as stated in the first bill of exceptions.

2. Because the court below erred in refusing to give the instructions prayed for by the plaintiff in error, in his second bill of exceptions.

3. Because the court below erred in refusing to give the instructions as moved for in the third bill of exceptions.

4. Because the court below erred in refusing the instructions moved for in the fourth bill of exceptions.

5. Because the court below erred in giving the instructions prayed for by the petitioners in the fifth bill of exceptions.

There is no denial that Rachel Wallingsford was, at the time of the deed of manumission, the wife of the plaintiff in error. There had been no judicial separation, no divorce. Nor is it denied that the defendant in error was at one period the slave of the plaintiff in error.

The questions then which present themselves, are :

1. Whether a wife separated from her husband can do any act by deed which will bind him at law, and deprive him of his property, without his express consent and authority.

2. Whether if a wife can so contract, yet is not the introduction of a trustee necessary ; and are not her acts without the aid of a trustee null and void.

If no contract is valid, if none can be made ; then the plaintiff in error is right, and the judgment of the circuit court must be reversed.

There is an absolute disability in a wife to make any contract, or to execute any valid deed. 15 Serg. & Rawle 90 ; Petersdorf's

[Wallingsford v. Allen.]

Abrid; 53, 55, 57, 65 ; Story's Conflict of Laws 125.   In all these authorities it is held that a wife cannot execute a contract, separately from her husband.

It is admitted that there are exceptions to these principles : as when the husband has abandoned his wife, or has abjured the realm ; she may contract.   But these exceptions have no application to the case before the court.

It cannot be said that the plaintiff in error abandoned his wife. She left him, and she resisted every effort to induce her to return. Cited, 2 Kent's Com. 160, 161, 175, 176 ; 4 Petersdorf 40, 41 ; 2 Harr. & Johns. Rep. 485.

The instruction given by the circuit court, that the ability of the mether to maintain the children would be sufficient to legalize the manumission of the infants ; was in direct opposition to decisions of the courts of Maryland, on the statutes of that state.

For a considerable period, there was an express prohibition by the laws of Maryland of manumissions in any form.   This was prior to 1796.   It was the settled policy of the state not to allow any slaves to be set free.   By the act of 1715, ch. 44, sect. 22, all negroes were declared slaves for life ; and this law deprived the owners of slaves of the right to give any one of them freedom.   Then came the statute of 1796, which prohibits manumission of persons not able to maintain themselves.   This act makes all deeds of manumission of such persons, absolutely void.   But for the act of 1796, no manumissions could be made ; and none are valid which do not conform to that law.   It cannot be contended that infants of three years old and under, have such ability.   Cited, 6 Harr. & Johns. 18, 19 ; 4 Harr. & Johns. 262.

These laws have full operation in the District of Columbia, on the east side of the Potomac; and they govern the case before the court. They make the deed of manumission void, even if the grantor of the same was competent to give it.   The decisions of the Maryland courts on this statute, made since the establishment of the District, may not be authority in this court ; but as they give a construction to the statutes of the state, the court will regard them as entitled to great consideration.

Mr Dandridge and Mr Key, for the defendant, insisted on the capacity of Mrs Wallingsford to execute the deed.   She was a feme sole : she had been abandoned by her husband : she was within the

[Wallingsford v. Allen.]

exceptions to the rule which vacates the contracts or deeds of married women. Cited, 1 Kent's Com. 157; 6 Pick. Rep, 89; 15 Mass. Rep. 31; 2 John. Ch. Ca. 537; 1 Atk. 278.

The agreement by which the defendant in error became the property of Mrs Wallingsford, was a substitute for the allowance of alimony, and relieved the estate of the husband from a heavy responsibility. If no property in the slave was acquired by the wife, nothing was received by her; and the effort now made is to set up a fraud for the benefit of the perpetrator of it. The very nature of the transaction made the defendant in error the separate property of Mrs Wallingsford. It was left by the circuit court to the jury to say, whether the arrangement was not binding on the husband; and they decided that it was. This gave the defendant in error and her children their freedom.

It was entirely competent to the husband to give his wife this property; and the facts of the case show, that the emancipation of the defendant in error was for a pecuniary consideration. The sum of 150 dollars was paid to her for the deed. She had been living in a different jurisdiction for many years: she was in great distress; and her husband gave her the girl for her support and maintenance. She had a right to dispose of her as she did, to procure the means of living.

As to the construction given by the counsel for the plaintiff in error to the laws of Maryland, Mr Key contended that the thirteenth and twenty-ninth sections of the law of 1796, ch. 67, are different. In the one case, the case of a will, there are prohibitory words; and not in the other.

Further, the expressions in the twenty-ninth section are, slave or slaves: any person having *slaves* may emancipate them, if sound, healthy, and able by labour to earn a living, &c. Now these slaves in this deed, taking them, as the words allow, and as the spirit of the law would allow, *in the aggregate*, are able to maintain themselves.

Again, the decision in such a case should be, not that the deed is void, but that the freedom is not to commence by it till the children are of sufficient age.

Mr Justice WAYNE delivered the opinion of the Court.

This was a petition in the court below, by the appellees, for freedom; complaining that they were unjustly held and claimed by the

[Wallingsford v. Allen.]

appellant as his slaves. The petitioner gave in evidence a deed of manumission for herself and two children, from one-Rachel Wallingsford. Her third child was born after she was manumitted.

It appears that Rachel Wallingsford resided in Washington several years previous to the date of the deed of manumission, living apart from her husband, the appellant: that she had a suit pending against him in Maryland, where he resided, for alimony, and had been allowed, by the order of the court, 120 dollars per annum, pendente lite. Some time after this allowance had been made, her husband gave her the petitioner, Sarah Ann, and some other property, in discharge of her alimony.: that after this agreement between them, the said Rachel continued to live in Washington until her death, having kept Sarah Ann in her service until the deed of manumission was executed. After the death of Mrs Wallingsford, the appellant claimed Sarah Ann and her children as his slaves. All of the children were born after Sarah Ann was given up by the appellant to Mrs Wallingsford. The appellant proved, at the time the deed of manumission was made, that Rachel Wallingsford was his lawful wife. It also appears, by a petition filed by the appellant in the county court of Prince George county, Maryland, to get the interlocutory order for alimony suspended, and which is in evidence in the cause, that the appellant and his wife, having had repeated disagreements, as she alleged on account of her husband's habitual incontinency with a woman in their own house, Mrs Wallingsford left her habitation and refused to live with him. The charge of incontinency is denied by the husband; but he admits, after his wife's departure, and upon her refusing to comply with his solicitations to return and live with him, that by an express agreement between them, he gave to her the woman Sarah Ann and other property, with two notes of hand, one for 120 dollars and the other for 200 dollars; in all amounting to 900 dollars; which was the amount the wife brought with her when they were married, and of which the appellee Sarah Ann was a part. This was to be received by the wife in full of all further claim for support; and the husband was to be discharged from the payment of alimony decreed by the court. Wallingsford having refused to pay the notes of hand, and the suit for alimony being still pending, the parties again met, and a final separation took place between them; upon the footing, that the wife was to retain the woman Sarah Ann; that each was to retain besides, "the property each had, and to be quits for ever." In consideration of the husband

[Wallingsford v. Allen.]

having agreed to this, the wife agreed to yield her claim for alimony, granted by the interlocutory order of the court, and was to discontinue her suit.

On the trial of the cause, the admission of the deed of manumission, as evidence, was excepted to by the defendant; but the court overruled the exception. The defendant also prayed the court to instruct the jury, if they should believe, from the evidence, that Mrs Wallingsford held the petitioners by virtue of an agreement between her and her husband, without the intervention of a trustee, that the agreement was void; and could give to her no power to manumit the slaves held under it: also, if the jury shall believe, from the evidence, that the agreement was made without a covenant on the part of a trustee, or some person capable of contracting with the husband, that the same was null: also, if the jury shall believe that the agreement was made on condition that Mrs Wallingsford should relinquish all claim to alimony, and that she did not comply with such condition, and did prefer against him a subsequent claim for alimony, that the agreement cannot be enforced against the defendant: and lastly, to instruct the jury, if they shall believe, from the evidence, that the petitioners, or any of them, at the time of the execution of the deed of manumission, were not able by their labour to procure for themselves sufficient food and raiment, with other necessaries of life, that then the said deed was inoperative to them. The court gave the last instruction to the jury, but refused to give the rest. And upon the prayer of the petitioner, instructed the jury, if they should believe from the evidence, that Sarah Ann Allen and her children were of healthy constitutions, and sound in mind and body, and that the mother was capable by labour to procure them sufficient food and raiment, with other necessaries of life, and did maintain them; then such children are not under the incapacity intended by the law of Maryland, in the act providing for the manumission of slaves.

The section of the act of 1796, 2 Maxcy's Laws of Maryland 360, is as follows: "that where any person or persons possessed of any slave or slaves within this state, who are or shall be of healthy constitutions, and sound in mind and body, capable by labour to procure to him or them sufficient food and raiment, with other necessaries of life, and not exceeding forty-five years of age, and such person or persons possessing such slave or slaves as aforesaid, and being willing and desirous to set free or manumit such slave or slaves, may, by writing under his, her or their hands and seals, evidenced by two

[Wallingsford v. Allen.]

good and sufficient witnesses at least, grant to such slave or slaves his, her or their freedom; and that any deed or writing, whereby freedom shall be given or granted to any such slave, which shall be intended to take place in future, shall be good to all intents, constructions and purposes whatsoever, from the time that such freedom or manumission is intended to commence by the said deed or writing; so that such deed and writing be not in prejudice of creditors; and that such slave, at the time such freedom or manumission shall take place or commence, be not above the age aforesaid, and be able to work and gain a sufficient livelihood and maintenance, according to the true intent and meaning of this act." The act prescribes how such deeds shall be executed, acknowledged and recorded; and upon a compliance with what is prescribed in those regards, a copy of the record, duly attested under the seal, &c. &c., "shall at all times hereafter be deemed, to all intents and purposes, good evidence to prove such freedom."

We will consider, together, the exception taken to the introduction of the deed of manumission as evidence, the last instruction asked by the defendant, and that asked by the petitioners, both of which were given to the jury by the court. The deed was not objected to for any deficiency in its execution, or on account of its not having been properly acknowledged and recorded. The last was done as far as that part of the law can be complied with in the District of Columbia. The deed was also acknowledged by the person making it, on the day it was executed, before a justice of the peace. It was then properly sent to the jury as evidence of the fact of manumission; and what its validity might be to give freedom, was a question of law to be determined by the court. As to the instructions asked by the defendant and the petitioners, relative to the petitioners being comprehended within the incapacity of the section of the act of Maryland just recited; both, we think, were rightly given by the court. That of the defendant was very general, and the court was not obliged by it to particularize to which of the petitioners it was intended to be applied. It was, therefore, correctly answered by a general instruction directing the jury to inquire into the fact; at the same time stating what the law was, if the jury should find the fact as the counsel of the defendant supposed it to be. That of the petitioners being more specific, was intended to obtain the court's interpretation of the act upon the point put; and we think the answer of the court, is in the true spirit of the law. We think the terms of the

act of Maryland, and the policy intended by it, were meant to prevent the manumission of slaves, who, from infancy, age or decrepitude, would become burthensome to the community at the time the deed of manumission should take effect: and to such as were over the age, after which manumission is prohibited. But the slave manumitted must either be positively in the latter predicament; or be so decrepid, if under the age of forty-five; and if neither one nor the other, and being in infancy, it must stand so unrelated to any other free person coloured or white, that it can have no claim, natural or artificial, to support from any one ;- and must, therefore, be at once a charge upon the charity of the community or a charge upon its poor laws. It would be an unreasonable restraint upon the privileges of manumission, as it is granted in this act, if it were interpreted to exclude the manumission of mother and an infant child, the former being of healthy constitution and able to maintain it, as of other children who, in the natural progress of human life would be able, in a few years, to maintain themselves by labour, and who would find in their adolescence, persons who would gladly maintain them for the services they could render. If this construction of the act does not prevail, there can be no fixed age in childhood when manumission can take effect; and the act would be made to operate differently upon persons by no certain rule. The legislature having laid down the age after which manumission shall not be made, a strong presumption is raised that it did not mean to exclude all infants absolutely from the benefits of the act, or it would have said so in terms; or have fixed an age when, in childhood, manumission should be allowed. If the policy of the law is to prevent slaves from being manumitted who would be burthensome to the community, we cannot hesitate in believing that the object will be accomplished by relying upon those natural affections of a mother for her child, which have always been found strong enough to cherish and sustain it ; except in some unnatural instances, as when the true nature of woman has been turned aside by some dreadful superstition or extraordinary necessity.

We are aware that opinions have been expressed in the courts of Maryland different from our conclusion, in regard to the manumission of children : but the point of a mother and infant manumitted at the same time, and the mother being in any way able, by her labour, to maintain her offspring; has not yet been decided against by the courts of Maryland, so far as we can gather from their re-

[Wallingsford v. Allen.]

ports. These opinions too, having been expressed since the cession of the District of Columbia to the United States, the courts in the district are not to be controlled by them in the interpretation of the act under review; as they would be, and as this court would be, by the decisions of state courts upon state statutes affecting local rights and interests.

The fourth instruction asked by the defendant, which the court refused to give, is, if the jury shall believe that the agreement between Wallingsford and wife was, that he should transfer the petitioner to her on condition that she should relinquish all claim to alimony against him; and that she did not comply with the condition, and did prefer against him a subsequent claim for alimony: that then the said agreement cannot be enforced against the defendant; nor can he be deprived of any of his rights by virtue of said agreement. We think this instruction was rightly refused; for though it is not denied that the suit for alimony had not been dis-discontinued, and was pending when Mrs Wallingsford died, the legal consequence would not be, that the agreement would be avoided by its not having been observed in that particular. The non performance of the agreement in that regard, did not restore to the defendant the ownership of property for which he had received a valuable consideration, by the relinquishment of his wife's alimony; of which he had the full benefit during her life; and continues to enjoy in the greater means he is presumed to have from having been relieved from the payment of the wife's alimony. But the instruction was asked in face of the evidence; which establishes the fact, that the substantial parts of the agreement were complied with, as the defendant had never been called upon for any part of the alimony, after the agreement was made, until the death of Mrs Wallingsford. A failure upon the part of the wife to comply with this part of the agreement, gave to the husband a good ground in equity to have the suit discontinued; but did not invalidate the agreement.

The remaining exceptions to be considered, are those relating to the nullity of the agreement; because it was made without the intervention of a trustee, or some one capable of contracting with the husband. The court refused to give such instructions.

The inability of the wife in this instance to contract or to take any interest from her husband, without the intervention of a trustee, was argued, upon the restraints imposed upon women by the common

[Wallingsford v. Allen.]

law, during coverture. This is a case which cannot be so considered. Neither the nature of the action, by which the petitioners sue to have their freedom established; nor the agreement between Wallingsford and his wife; would permit this court to take so narrow a view of the case. Every feature of the agreement is an appeal to have it tested by those principles of equity which have been applied to maintain a separate interest in women, acquired from their husbands during coverture; whether the same were made by the intervention of trustees or not; *when the transfer was fairly made upon a meritorious or valuable consideration.*

Agreements between husband and wife, during coverture, for the transfer from him of property directly to the latter, are undoubtedly void at law. Equity examines with great caution before it will confirm them. But it does sustain them when a clear and satisfactory case is made out, that the property is to be applied to the separate use of the wife. Where the consideration of the transfer is a separate interest of the wife, yielded up by her for the husband's benefit, or of their family; or which has been appropriated by him to his uses. Where the husband is in a situation to make a gift of property to the wife; and distinctly separates it from the mass of his property for her use. Either case equity will sustain, though no trustee has been interposed to hold for the wife's use. In Moore v. Freeman, Bunb. 205, it was determined, that articles of agreement between husband and wife are binding in equity, without the intervention of a trustee. Other cases may be cited to the same purpose. In regard to grants from the husband to the wife, an examination of the cases in the books will show, when they have not been sustained in equity, it has been on account of some feature in them impeaching their fairness and certainty, as that they were not in the nature of a provision for the wife; or when they interfered with the rights of a creditor; or when the property given or granted had not been distinctly separated from the mass of the husband's property. In Scanning v. Hyle, 3 P. Wms 334, Lord Talbot assumed the doctrine, that femes covert could have a separate interest by their husband's agreement. In the case of Lady Arundel v. Phipps, 10 Ves. 146, 149, Lord Eldon held, that a husband and wife after marriage could contract, for a bona fide and valuable consideration, for a transfer of property from him to her. In Sheppard v. Sheppard, 7 Johns. Ch. Rep. 57, it is said, husband and wife may contract, for a bona fide and valuable consideration, for a transfer of property from him to her.

[Wallingsford v. Allen.]

In Walles v. Hodge, 2 Swanst. 97, it is said, husband may convey to the wife a chattel. In the case of a gift from the husband to the wife, it is held valid when the husband, by some distinct act, divests himself of his property. As, for instance, in the case of Lucas v. Lucas, 1 Atk. 270, the lord chancellor held, that the transfer of 1000 pounds South Sea annuities by the husband, in the name of the wife, was so decisive an act, as amounted to an agreement by the husband that the property should become hers. It is not necessary to review here the cases of gifts to the wife by the husband, which have been sustained in equity. They are alluded to, to show how far equity has gone in maintaining transfers of property by the husband to the wife, without the intervention of a trustee; and when there was no valuable consideration money from the wife to the husband. But the case before us is one where a transfer of property must be considered as having been made for a valuable consideration. It was given in lieu of alimony, decreed by a court of competent jurisdiction, pendente lite; and passed the property as fully to the wife, as if the husband had conveyed it to a third person for a valuable consideration. In regard to that property, Mrs Wallingsford is to be considered as a feme sole; and her right to dispose of it followed as a matter of course.

Judgment of the circuit court affirmed.